# United States Court of Appeals for the Federal Circuit

---

**BMW OF NORTH AMERICA LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, TIMKEN COMPANY,**
*Defendants-Appellees*

---

2018-1109

---

Appeal from the United States Court of International Trade in No. 1:15-cv-00052-JCG, Judge Jennifer Choe-Groves.

---

SEALED OPINION ISSUED: May 9, 2019
PUBLIC OPINION ISSUED: June 14, 2019[*]

---

KAVITA MOHAN, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Washington, DC, argued for plaintiff-appellant. Also represented by NED H. MARSHAK, MAX FRED SCHUTZMAN, New York, NY.

TARA K. HOGAN, Commercial Litigation Branch, Civil

---

[*] This opinion was originally filed under seal and has been unsealed in part with the remaining sealed portions redacted from the public opinion.

Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by CLAUDIA BURKE, JEANNE DAVIDSON, JOSEPH H. HUNT.

GEERT M. DE PREST, Stewart & Stewart, Washington, DC, argued for defendant-appellee Timken Company. Also represented by WILLIAM ALFRED FENNELL, LANE S. HUREWITZ, PATRICK JOHN MCDONOUGH, TERENCE PATRICK STEWART.

———————————

Before PROST, *Chief Judge,* O'MALLEY and STOLL, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* STOLL.

Opinion dissenting-in-part filed by *Chief Judge* PROST.

STOLL, *Circuit Judge.*

BMW of North America LLC ("BMW") appeals the final judgment of the United States Court of International Trade, sustaining the United States Department of Commerce's application of an adverse facts available ("AFA") rate of 126.44% against BMW. We conclude that Commerce did not set forth its reasoning in sufficient detail to allow review of whether the selected AFA rate was unduly punitive. We therefore vacate the Court of International Trade's decision and remand for further proceedings consistent with this opinion.

BACKGROUND

I

Among its many duties, Commerce is charged with protecting domestic producers from foreign exporters' unfair trade practices. To this end, Commerce must investigate and impose antidumping duties on imported merchandise sold in the United States at less than fair value, causing

material injury or threatening to cause material injury to an industry in the United States.  *See* 19 U.S.C. § 1673. Generally, exporters of subject merchandise that have not been individually investigated during an antidumping duty investigation are subject to an "all-others rate" imposed in Commerce's final determination.  *Id.* § 1673d(c)(1)(B).  If an exporter or other interested party properly requests administrative review and is selected for individual examination, however, Commerce will reassess the antidumping duties applied to the exporter's subject merchandise using actual dumping margins for the period of review. *See id.* § 1675.

With this brief background, we turn to the relevant facts in this case.  On May 2, 2011, Commerce posted a notice in the Federal Register permitting interested parties to request an administrative review of antidumping duty orders on ball bearings and parts thereof from France, Germany, Italy, Japan, and the United Kingdom, for the period of May 1, 2010, through April 30, 2011.  *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 76 Fed. Reg. 24,460, 24,460–61 (May 2, 2011).   BMW timely requested administrative review of the antidumping duties on its imports of ball bearings and parts thereof from the United Kingdom.

In the meantime, the antidumping duty orders on ball bearings and parts thereof from Japan and the United Kingdom, which were first imposed on May 15, 1989, were undergoing sunset review.  To satisfy international treaty obligations, Commerce and the International Trade Commission ("ITC") must review antidumping duty orders every five years. *See Understanding Five-Year (Sunset) Reviews*, UNITED STATES INTERNATIONAL TRADE COMMISSION (Jan. 11, 2019).  To maintain an antidumping duty order, Commerce must determine every five years that revoking the order would be likely to lead to continuation or recurrence of dumping, and the ITC must determine that

revoking the order would be likely to lead to the continuation or recurrence of material injury to an industry in the United States. *Id.* Here, both agencies made the requisite determinations, but the Court of International Trade vacated and remanded the ITC's determination several times between 2006 and 2011. The ITC eventually determined that revocation of the orders would not be likely to lead to the continuation or recurrence of material injury to a U.S. industry within a reasonably foreseeable time, and the Court of International Trade affirmed the ITC on April 20, 2011. The judgment was appealed to our court and stayed until July 6, 2011.

On July 15, 2011, Commerce published a notice in the Federal Register stating that it was "revoking the anti-dumping duty orders on ball bearings and parts thereof from Japan and the United Kingdom." *Ball Bearings and Parts Thereof from Japan and the United Kingdom: Revocation of Antidumping Duty Orders*, 76 Fed. Reg. 41,761, 41,762 (July 15, 2011). The notice further indicated that, "[a]s a result of this revocation, the Department is discontinuing all unfinished administrative reviews immediately and will not initiate any new administrative reviews of the orders." *Id.* Commerce also noted that "the suspension of liquidation on all entries of ball bearings . . . will continue until there is a 'final and conclusive' court decision." *Id.* at 41,763. On May 16, 2013, our court reversed the Court of International Trade, and on November 18, 2013, the Court of International Trade reinstated the ITC's affirmative material injury determination.

On December 12, 2013, Commerce e-mailed counsel for all parties that had previously requested administrative review, stating only that it was "sending out a quantity-and-value-questionnaire to all respondents in the 5/1/2010–4/30/2011 administrative reviews of ball bearings and parts thereof from Japan and the United Kingdom." J.A. 134. The subject line of the email read "Ball Bearings from Japan and UK: AFBs 22 (2010–11) Quantity-and-

Value Questionnaire." *Id.*  On December 16, 2013, Commerce published a notice in the Federal Register, indicating that it was "hereby resuming the administrative reviews covering the period May 1, 2010 through April 30, 2011" and that the "deadline for withdrawing requests for review . . . will be 90 days after the date of publication of this notice." *Ball Bearings and Parts Thereof from Japan and the United Kingdom: Notice of Reinstatement of Antidumping Duty Orders, Resumption of Administrative Reviews, and Advance Notification of Sunset Reviews*, 78 Fed. Reg. 76,104, 76,105–06 (Dec. 16, 2013).  Counsel for BMW did not fill out the quantity-and-value-questionnaire, withdraw from administrative review, or otherwise respond to Commerce's communications.

## II

During an administrative review, the "burden of creating an adequate record lies with interested parties and not with Commerce." *Nan Ya Plastics Corp. v. U.S.*, 810 F.3d 1333, 1337 (Fed. Cir. 2016) (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)). This is because "the International Trade Administration, the relevant agency within Commerce, has no subpoena power." *Id.* at 1338.  If a respondent fails to provide requested information by the deadlines for submission, "Commerce shall fill in the gaps with 'facts otherwise available.'" *Nippon Steel Corp. v. U.S.*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1677e(a) (2000)).  Separately, if Commerce determines that an interested party has "failed to cooperate by not acting to the best of its ability to comply" with a request for information, it may use an adverse inference in selecting a rate from these facts.  *Id.* (quoting 19 U.S.C. §1677e(b)).  This is commonly known as the "AFA" rate.

On September 17, 2014, Commerce released its preliminary decision memorandum.  *Decision Memorandum for Preliminary Results of Antidumping Duty Administrative*

*Reviews; Ball Bearings and Parts Thereof from Japan and the United Kingdom; 2010-2011*, A-412-801, ARP 10-11, at 3 (Sept. 17, 2014) ("Preliminary Decision Memo"). Commerce noted that BMW "did not respond to [Commerce's] request to provide information concerning the quantity and value of its U.S. sales." *Id.* at 6. Finding that BMW had "failed to cooperate by not acting to the best of its ability to comply with the Department's requests for information," Commerce applied AFA to determine BMW's weighted-average dumping margin. *Id.* at 1, 6. Commerce applied a 254.25% AFA rate, which "represent[ed] the highest rate calculated in the petition with respect to ball bearings" from the United Kingdom.[1] *Id.* at 7. Commerce explained that, "[w]hen a respondent is not cooperative, the Department has the discretion to presume that the highest prior dumping margin reflects the current weighted-average dumping margin." *Id.* Commerce reasoned that if the actual dumping margins were otherwise, the "party would produce current information showing its rate to be less." *Id.* Commerce found that the 254.25% rate was sufficiently probative of BMW's actual dumping margins, as it "falls within the range of individual dumping margins which we calculated for [the representative exporter] in the instant administrative review concerning ball bearings from the United Kingdom."[2] *Id.* at 8. In contrast, the other parties

---

[1] The "petition" refers to the original request filed by Appellee Timken Co., a domestic interested party, asking that Commerce investigate potential dumping of ball bearings and parts thereof into the U.S. market. Petitions must include all factual information relevant to the calculation of dumping margins on the subject merchandise. *See* 19 C.F.R. § 351.202(b)(7).

[2] Because Commerce found that it "was not practicable to individually examine each company for which a review was initiated," Commerce selected NSK Bearings Europe Ltd. and NSK Europe Ltd. (collectively, "NSK") to

who had requested administrative review of the U.K. anti-dumping duty order received rates of 1.55%. *Ball Bearings and Parts Thereof from Japan and the United Kingdom: Preliminary Results of Antidumping Duty Administrative Review; 2010–2011*, 79 Fed. Reg. 56,771, 56,772 (Sept. 23, 2014). The "all-others" rate remained 54.27%.

On October 23, 2014, BMW submitted a brief to Commerce, raising three main points: (1) the administrative review had been improperly reinstated; (2) the procedural anomalies, years-long delay, and changes in counsel meant BMW was entirely unaware it even had an administrative review pending; and (3) the AFA rate assigned to BMW was excessive and unreasonable. In its final results and accompanying decision memorandum, Commerce responded that, while this was indeed the first time it had automatically reinstated an administrative review following appellate court review, it nevertheless had the discretion to do so. Further, because BMW did not respond to the quantity-and-value questionnaire, it did not cooperate, and thus application of an AFA rate was proper. Finally, Commerce explained that the AFA rate was not excessive and unreasonable, as it is Commerce's "normal practice in an administrative review to select as AFA the highest rate on the record of the proceeding that can be corroborated." *Issues and Decision Memorandum for the Antidumping Duty Administrative Review of Ball Bearings and Parts Thereof from the United Kingdom; 2010–2011*, A-412-801, ARP 10-11, at 14 (Jan. 21, 2015). According to Commerce, because "a cooperative respondent, NSK, had transaction-specific dumping margins in excess of 254.25 percent," the "petition margin is a reasonable rate incorporating an adverse

---

represent the twelve exporters who had requested administrative review of the antidumping duty order. *See* Preliminary Decision Memo at 5.

inference for a company that did not respond to our request for information." *Id.* at 15.

BMW filed a complaint in the Court of International Trade. The Court of International Trade held that Commerce had the authority to resume the discontinued review without having to initiate a new review. *BMW of N. Am. LLC v. United States,* 208 F. Supp. 3d 1388, 1393–94 (Ct. Int'l Trade 2017). The Court of International Trade also concluded that Commerce's use of AFA was supported by substantial evidence. The court identified the fact that "every other respondent in this review responded to the [quantity-and-value] questionnaire," coupled with BMW's "failure to monitor the status of the litigation that led to the revocation of the very order that [BMW] requested to be reviewed" as substantial evidence supporting "Commerce's conclusion that Plaintiff failed to act to the best of its ability." *Id.* at 1395.

The Court of International Trade found that the AFA rate of 254.25%, however, was not corroborated or supported by substantial evidence. *Id.* at 1398. The court noted that "the purpose of AFA is to 'provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins.'" *Id.* at 1396. The court further noted that while the petition Commerce relied on "alleged dumping at 254.25 percent, the two individually investigated parties received rates of 61.14 percent and 44.02 percent, respectively, while the all others rate was calculated at 54.27 percent." *Id.* at 1397. The court rejected Commerce's attempt to corroborate this rate based on the representative exporter's "transaction-specific dumping margins in excess of 254.25 percent," reasoning that these margins represented [redacted] of the representative exporter's total transactions, and were thus aberrational. *Id.*

On remand, Commerce applied an AFA rate of 126.44%, which it explained was:

the highest transaction-specific dumping margin that forms part of a closely-connected range of transaction-specific margins (i.e., it falls on a [redacted] of transaction-specific dumping margins in the sense that [redacted]).

*Results of Remand Determination*, A-412-801, ARP 10-11, at 6 (May 11, 2017) ("Remand Determination"). Commerce found "no circumstances indicating that the selected rate is aberrational or otherwise not appropriate as AFA" as the quantity, price, and circumstances surrounding the transactions were not unusual. *Id.* at 6–7. As to BMW's argument that the rate was "punitive" and inconsistent with BMW's "level of culpability," Commerce responded that "it appears that BMW is actually seeking to relitigate the Department's determination to apply facts available with an adverse inference in the first instance." *Id.* at 16. Commerce further noted that a "respondent who has not cooperated in a review should not benefit from its non-cooperation." *Id.* at 17. Continuing, Commerce explained that "[a]ssigning to BMW a rate that is higher than its existing cash deposit rate [54.27 percent], or than NSK's calculated 1.43 percent rate, is adverse, not 'punitive.'" *Id.*

The Court of International Trade affirmed, concluding simply that:

> [Commerce's] analysis indicates that the 126.44 percent rate, while high, was neither aberrational nor punitive. Commerce exercised its statutory discretion in applying AFA and selected a rate from the highest, non-aberrational, transaction-specific margin. The selected rate strikes a reasonable balance, as it serves the goal of inducing cooperation with Commerce's administrative review procedures and is not based on an aberrational rate.

*BMW of North America LLC v. United States*, 255 F. Supp. 3d 1342, 1347 (Ct. Int'l Trade 2017).

DISCUSSION

BMW makes two primary arguments on appeal: (1) that Commerce unlawfully reinstated the administrative reviews after they had been terminated; and (2) that Commerce's selection of the 126.44% AFA rate was unduly punitive and unsupported by substantial evidence. We address each issue in turn.

I

We first address whether, after it discontinued the administrative reviews, Commerce had the authority to resume them following our court's reversal of the Court of International Trade's revocation of the antidumping duty orders. Commerce's authority to conduct an administrative review stems from 19 U.S.C. § 1675, and entails four steps:

> (1) Commerce publishes a notice of Opportunity to Request an Administrative Review for the [period of review] at issue; (2) upon receipt of such request, Commerce publishes a notice of Initiation of an Administrative Review in the Federal Register; (3) Commerce, in order to obtain pertinent information, distributes or makes available questionnaires to those entities Commerce designated in the notice of Initiation; and (4) on the basis of the information gathered, Commerce determines the antidumping duty rates applicable to each entry or type of entries and publishes these determinations in the Federal Register.

*Transcom, Inc. v. United States*, 123 F. Supp. 2d 1372, 1374 (2000) (first citing 19 U.S.C. § 1675(a) (1994); then citing 19 C.F.R. §§353.22, 353.31 (1995)). Under 19 U.S.C. § 1675(a)(3)(A), Commerce must "make a preliminary determination . . . within 245 days after the last day of the month in which occurs the anniversary of the date of the publication of the order [for which review is requested]."

BMW argues that Commerce's notice that it was "discontinuing all unfinished administrative reviews" effectively terminated the reviews, and, as such, Commerce had to restart the four steps outlined in *Transcom* to conduct a new administrative review. BMW further argues that Commerce was required to publish its preliminary determination 245 days after the last date of the month in which the order was published, which was January 31, 2012, and thus could not resume the discontinued administrative reviews on December 16, 2013, over a year after the statutory deadline.

Commerce responds that the administrative reviews were expressly "discontinued," not "terminated." Commerce further asserts that the revocation notice clearly indicated that there was a pending appeal, that it did in fact complete all four steps required in *Transcom*, and that it had the discretion to suspend the statutory deadlines pending appeal.

We evaluate Commerce's interpretation of a statute in accordance with *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under the *Chevron* framework, we first examine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If so, then both we and Commerce must defer to Congressional intent. *Id.* at 843. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* We will deem an "unreasonable resolution of [statutory] language" impermissible. *See Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1364 (Fed. Cir. 2014) (quoting *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009)).

In *Timken Co. v. United States*, we held that Commerce must publish notice of an adverse Court of International Trade decision within ten days of issuance of the judgment, and suspend liquidation of imports "until there is a

*conclusive* decision in the action."   893 F.2d 337, 341 (Fed. Cir. 1990). *Timken*, however, addressed the interpretation of a statute that spoke directly to such matters. *See id.* at 339 (explaining that the dispute centered around the parties' interpretation of the term "final decision" in § 1516(a)(e)).  Here, there is no such statutory scheme that addresses the effect of an adverse decision on an administrative review.  While the statute does cover deadlines for providing the results of an administrative review, it does not state how revocation of the underlying order and subsequent reinstatement would affect these deadlines.

Given that the relevant statutory framework is silent on these issues, we proceed to *Chevron* step two and consider whether Commerce's interpretation—allowing it to resume the discontinued reviews—is a permissible reading of the statute.  We conclude that it is.  First, the statute expressly grants Commerce the authority to conduct these reviews upon request. *See* 19 U.S.C. § 1675.  And the statute does not restrict Commerce's authority on this point, instead broadly directing Commerce to "review, and determine . . . the amount of any antidumping duty."  19 U.S.C. § 1675(a)(1)(B).  Next, there is no dispute that an underlying antidumping order survives revocation and subsequent reinstatement.  It is reasonable, therefore, to interpret the related administrative review thereof as similarly surviving revocation.  Commerce, moreover, properly complied with its administrative requirements in reinstating the review by, for example, sending out a quantity-and-value-questionnaire and publishing notice of the resumption of administrative review in the Federal Register.  Finally, allowing Commerce to resume a prior-revoked review is consistent with the language of § 1675(f), governing suspension agreements.  Under § 1675(f), when the reason for a suspended investigation no longer exists, "the suspension agreement shall be treated as not accepted, beginning on the date of publication of the Commission's determination, and the administering authority and the Commission

shall proceed . . . *as if the suspension agreement had been violated on that date*." (emphasis added).  Similar to a negative determination of a suspension agreement, reinstatement of a prior-revoked review should cause Commerce to proceed as if the order had not been revoked.  *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("[W]e must read the words in their context and with a view to their place in the overall statutory scheme." (internal quotation marks omitted)).  We thus conclude that Commerce's interpretation allowing it to resume the discontinued reviews was not an "unreasonable resolution."  *Thai Plastic*, 746 F.3d at 1364 (quoting *Eurodif*, 535 U.S. at 316).  As such, Commerce's decision to resume was permissible.

To be sure, BMW's stated belief that the revocation notice terminated the administrative review is not unreasonable.  Commerce did not have guidelines on the process for conducting an administrative review in the event of reinstatement of a revoked antidumping duty order.  Despite both parties' protestations, the word "discontinue" does not have a clear meaning in this context, and the term is not itself defined in any relevant statute or regulation.  It is unclear that Commerce even contemplated the possibility of resuming the reviews at the time the revocation notice was written.

Regardless, BMW's subjective belief that its administrative review had been permanently terminated does not impact the *authority* of Commerce to resume that review.  The sole question before us is whether the relevant statutory framework permits such an action.  With due deference to Commerce's interpretation of the statute as required by *Chevron*, we hold that it does.

## II

BMW next argues that the 126.44% AFA rate selected by Commerce is excessive, aberrational, unduly punitive, and unsupported by substantial evidence.  In particular, BMW argues that because it was completely unaware that

it had an administrative review pending, in large part because of the procedural anomalies that occurred during the review, the 126.44% rate does not reflect its level of culpability nor its commercial reality.

When reviewing Commerce's anti-dumping determinations, this court "applies anew the standard of review applied by the Court of International Trade in its review of the administrative record." *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000). "In doing so, we uphold Commerce's determination unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Id.* (quoting 19 U.S.C. § 1516a(b)(1(B)(i)(1994)). "This court reviews *de novo* the trial court's answers to all questions of law, including statutory interpretation questions; evidentiary decisions . . . are reviewed for abuse of discretion." *Id.* "Although we review the decisions of the CIT de novo, we give great weight to the informed opinion of the CIT and it is nearly always the starting point of our analysis." *Nan Ya*, 810 F.3d at 1341.

Under 19 U.S.C. § 1677e(b)(1), if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" it "may use an inference that is adverse to the interests of that party in selecting from the facts otherwise available." *Id.* § 1677e(b)(1). Under § 1677e(b)(2), such an adverse inference "may include reliance on information derived from," inter alia, "the petition" or "any other information placed on the record." We have recognized that the "purpose of section 1677e(b) is to provide respondents with incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *De Cecco*, 216 F.3d at 1032. The AFA rate is intended "to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *Id.* While "a higher adverse margin creates a

stronger deterrent," Commerce must not "overreach reality in seeking to maximize deterrence." *Id.*

We have also previously held that Commerce has wide discretion to assign the "highest calculated rate" to uncooperative parties. *KYD, Inc. v. United States*, 607 F.3d 760, 766 (Fed. Cir. 2010); *see also Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002); *De Cecco*, 216 F.3d at 1029. We have sustained the use of the highest calculated rate as "it reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced *current* information showing the margin to be less." *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (emphasis in original). The use of the highest rate is not automatic, however, and "will depend upon the facts of a particular case." *Nan Ya*, 810 F.3d at 1347.

The Court of International Trade has held that Commerce must be "mindful of the purpose of § 1677(e)(b)" when determining an AFA rate, and thus, an unusually high rate is permissible when it is "necessary to serve the purpose of deterrence[.]" *Papierfabrik Aug. Koehler AG v. United States*, 180 F. Supp. 3d 1211, 1231–32 (Ct. Int'l Trade 2016), *aff'd sub nom. Papierfabrik Aug. Koehler SE v. United States*, 710 F. App'x 889 (Fed. Cir. 2018). In *Papierfabrik*, the Court of International Trade affirmed Commerce's selection of an unusually high 75.36% AFA rate when it was imposed to deter serious misconduct by the petitioner, including deliberate falsity and intentional concealment. *Id.* In reaching this decision, the Court of International Trade specifically looked to the facts surrounding the uncooperative party's failure to cooperate, noting that the Department of Commerce's finding that the party had intentionally and fraudulently undermined the entire proceeding was "an integral part of the Department's reasoning for imposing the highest rate in any previous segment of the proceeding." *Id.* The Court of

International Trade further explained that "the serious-ness of the type of misconduct Commerce was seeking . . . to deter cause[d] the court to conclude that Commerce did not overreach in assigning the 75.36% rate." *Id.* The court thus based its decision on the complete factual record and the seriousness of the conduct committed. We agree, and common sense dictates, that Commerce should consider the overall facts and circumstances of each case, including the level of culpability of the non-cooperating party in an AFA analysis.[3] And, contrary to the Dissent's view that our case law does not contemplate an inquiry into the seriousness of the uncooperative party's conduct when selecting a non-pu-nitive AFA rate, *see* Dissent Op. at 3, we affirmed the Court of International Trade's decision in *Papierfabrik*, wherein,

---

[3]      Our decision relies on case law that interprets stat-utory language that is identical in both versions of the stat-ute pre-and-post-dating the amendments made by Congress in the Trade Preferences Extension Act ("TPEA"), and thus we need not reach BMW's argument that Com-merce improperly applied the TPEA to its May 2017 re-mand determination. *See* Trade Preferences Extension Act (TPEA) of 2015, Pub. L. No. 114-27, 129 Stat. 362, 383–87 (2015). In any event, the amended version of the statute further supports our view that Commerce should consider the level of culpability of the uncooperative party. Now, under § 1677e(d)(2), "the administering authority may ap-ply any of the countervailable subsidy rates or dumping margins specified under [paragraph (1)], including the highest such rate or margin, *based on the evaluation by the administering authority of the situation that resulted in the administering authority using an adverse inference in se-lecting among the facts otherwise available.*" (emphasis added). This language undermines the Dissent's view that it is unnecessary for Commerce to consider surrounding facts and circumstances when selecting an appropriate rate. *See* Dissent Op. 3.

as discussed, the AFA rate selected was specifically based on "the seriousness of the type of misconduct" committed by the uncooperative party. *Papierfabrik*, 710 F. App'x 889 (Fed. Cir. 2018).

It is clear from these cases that Commerce has wide discretion when it comes to selecting an AFA rate for non-cooperating parties. *See De Cecco*, 216 F.3d at 1033 ("Commerce, not the courts, must make determinations as to proper anti-dumping margins."). It is also clear, however, that this discretion is not without limits. The appropriate rate "will depend upon the facts of a particular case," *Nan Ya*, 810 F.3d at 1347, cannot be "punitive, aberrational, or uncorroborated," *De Cecco*, 216 F.3d at 1032, includes "*some* built-in increase" to deter non-compliance, *id.* (emphasis added), and, as noted above, reflects the seriousness of the non-cooperating party's misconduct.

It is with this framework in mind that we consider whether Commerce's application of the 126.44% AFA rate against BMW was proper. As Commerce correctly noted, because the AFA rate was selected from primary, rather than secondary, information, there is no corroboration requirement. *See Remand Determination* at 8; *see also* 19 U.S.C. § 1677e(c). In addition, Commerce explained in detail that the selected rate is the highest of a [redacted] of the representative exporter's transaction-specific margins and that the quantity, price, and other circumstances surrounding the transactions were not unusual. *Remand Determination* at 6–7. This is sufficient to demonstrate that the selected rate is, in a literal sense, "non-aberrational."

BMW also argued, however, that the selected AFA rate was unduly punitive and inconsistent with its level of culpability. Commerce largely ignored this argument, instead reiterating that a "respondent who has not cooperated in a review should not benefit from its non-cooperation," and that "[a]ssigning to BMW an AFA rate that is higher than its existing cash deposit rate [54.27

percent], or than [the representative exporter]'s calculated 1.43 percent rate, is adverse, not 'punitive.'" *Id.* at 17. Though Commerce is at liberty to exercise its judgment and select a rate it finds appropriate to deter non-compliance, there is an extremely large range of rates between 1.43% and 126.44%. Commerce did not consider or address BMW's argument regarding its mitigating circumstances or explain why it determined that the 126.44% rate was appropriate given the unique factual circumstances surrounding BMW's failure to return the quantity-and-value questionnaire.

While we are mindful of the great deference given to Commerce in making these determinations, without any articulation of its rationale for finding that the selected rate was not unduly punitive, we are limited in our review. Our case law establishes that Commerce must consider the totality of the circumstances in selecting an AFA rate, including, if relevant, the seriousness of the conduct of the uncooperative party. Here, Commerce did not address how the procedural irregularities surrounding the administrative review process affected its view of BMW's level of culpability. On this record, we cannot ascertain whether Commerce properly selected an AFA rate that was not unduly punitive. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (explaining that reviewing courts "cannot exercise their duty of review unless they are advised of the considerations underlying the action under review"). As we are unable to affirm Commerce's determination, we vacate the judgment of the Court of International Trade and remand for further proceedings.

CONCLUSION

We conclude that Commerce lawfully resumed BMW's administrative review after reinstatement of the related antidumping duty order, but must explain its consideration of the particular factual circumstances surrounding BMW's failure to cooperate with Commerce's request for

information when considering whether its selected AFA rate of 126.44% was unduly punitive. Accordingly, we vacate the judgment of the Court of International Trade and remand for further proceedings consistent with this opinion.

## VACATED AND REMANDED

### COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**BMW OF NORTH AMERICA LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, TIMKEN COMPANY,**
*Defendants-Appellees*

---

2018-1109

---

Appeal from the United States Court of International Trade in No. 1:15-cv-00052-JCG, Judge Jennifer Choe-Groves.

---

PROST, *Chief Judge*, dissenting-in-part.

After considering the facts and circumstances leading to BMW's failure to cooperate with the Department of Commerce's ("Commerce") request for information, Commerce applied adverse facts available ("AFA") to BMW, then selected an AFA rate from actual sales information. In the Majority's view, Commerce did not do enough to justify its selection of the AFA rate applied. According to the Majority, Commerce must also explain, based on those factual circumstances, why the AFA rate it selected was not unduly punitive. *See* Majority Op. 19. This request may seem reasonable at first blush, for who could disagree with a simple request for further explanation? But the problem is that Commerce simply has no such obligation under the

statute or our case law.  To be sure, the factual circumstances of a case may be relevant to deciding whether to apply an AFA rate at all—a decision not contested here on appeal.[1]  But Commerce need not *re-consider* those facts when setting the rate.

In my view, the Majority has erred by imposing new, extra-statutory limits on the discretion that Congress granted to Commerce.  Worse yet, those limits are ill-defined and amorphous, making Commerce's job harder and our review function difficult, if not impossible.  *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1345 (Fed. Cir. 2016) ("[A] court errs in adopting an interpretation of a statute that would create a tremendous burden on Commerce that is not required or suggested by the statute." (internal citation and quotation marks omitted)).  For example, what are the subjective criteria to be applied in assessing whether one AFA rate versus another is "unduly punitive"?  "Congress decided what requirements Commerce must fulfill in reaching its determinations," and this court should not "impose conditions not present in or suggested by the statute's text."  *Id.* at 1347.  Because the Majority does not heed this instruction, I respectfully dissent from section II of the Majority's opinion.

## I

I begin with the language of the statute.  Section 1677e(b) requires Commerce to perform fact-finding as a condition precedent to using an adverse inference.  *See* 19 U.S.C. § 1677e(b) (2012) ("If [Commerce] finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with the request for information . . . [Commerce] . . . may use an inference that is adverse to the interests of that party in selecting from

---

[1]    Oral Argument at 1:54–59 (Q: "There's no dispute that an AFA rate is justified, right"?  A: "That's correct.").

among facts otherwise available."). Thus, Commerce must fully consider the circumstances leading to a respondent's noncooperation before it decides to draw an adverse inference in the first instance. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) ("Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information.").

The statute does not require Commerce, contrary to the Majority's view, to *re-consider* those facts and circumstances when selecting an appropriate, non-punitive AFA rate. *See* 19 U.S.C. § 1677e(b) ("Such adverse inference may include reliance on information derived from (1) the petition, (2) a final determination in the investigation under this title, (3) any previous review under section 751 [19 U.S.C. § 1675] or determination under section 753 [19 U.S.C. § 1675b], or (4) any other information placed on the record."); *see also Nippon Steel*, 337 F.3d at 1383 (Fed. Cir. 2003) ("[S]ection 1677e(b) does not by its terms set a 'willfulness' or 'reasonable respondent' standard, nor does it require findings of motivation or intent. Simply put, there is no *mens rea* component to the section 1677e(b) inquiry.").

Nor does our case law contemplate an inquiry into the "seriousness of the conduct of the uncooperative party," Majority Op. 18, when selecting a non-punitive AFA rate, as the Majority would require, *see, e.g.*, *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1378–82 (Fed. Cir. 2016) (considering reasons for failure to cooperate when determining the propriety of assigning an AFA rate in the first place, but not when determining whether substantial evidence supports Commerce's selection of a specific AFA rate); *PAM, S.p.A v. United States*, 582 F.3d 1336, 1339–40 (Fed. Cir. 2009) (same). To avoid selecting a punitive AFA rate, Commerce must simply ensure that it does not "overreach reality in seeking to maximize deterrence." *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v.*

*United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). That is all that is required.[2]

With this legal framework in mind, I turn to the facts of this case. In my view, Commerce easily satisfied its obligations under the statute and our case law.

## II

First, Commerce considered the totality of circumstances leading to BMW's unresponsiveness and found, among other things, that there was "no reason to believe or suspect that the email [Commerce sent to BMW's counsel] was not delivered," that "every other respondent in this review responded to the Q&V questionnaire," and that BMW's "failure to cooperate need not be intentional" for an AFA rate to apply. J.A. 738–39.[3] Accordingly, Commerce

---

[2]    The Majority seems to suggest that our case law contemplates an inquiry into the seriousness of the uncooperative party's conduct when selecting an AFA rate because a panel of this court summarily affirmed under Federal Circuit Rule 36 a Court of International Trade decision that included such reasoning. Majority Op. 17. But a Rule 36 judgment simply affirms the prior tribunal's *judgment*. *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1350 (Fed. Cir. 2013). "It does not endorse or sustain any specific part of the prior tribunal's reasoning." *Id.* Moreover, the specific issues raised in that appeal were unrelated to whether the selected AFA was punitive. *See Papierfabrik Aug. Koehler SE v. United States*, No. 16-2425, ECF No. 32 at 3 (Appellant's Opening Brief).

[3]    "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Nippon Steel*, 337 F.3d at 1383.

decided, based on the specific circumstances of this case, to assign an AFA rate to BMW.[4]

Second, substantial evidence supports that BMW's AFA rate was a "reasonably accurate estimate of [BMW's] actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *See De Cecco*, 216 F.3d at 1032. By definition, such a rate is adverse, not punitive. *See id.* At the outset, I note that BMW's failure to cooperate deprived Commerce of the most direct evidence of BMW's actual dumping margin. *See KYD, Inc. v. United States*, 607 F.3d 760, 767 (Fed. Cir. 2010). And because Commerce had never before reviewed BMW, Commerce could use only the information it had at its disposal to determine an appropriate AFA rate for BMW. Logically, it used the sales information it received from a mandatory respondent, NSK.

Further, there was more than sufficient basis for Commerce's conclusion that 126.44% was reliable and well-grounded because that margin was supported by "Commerce's calculation of 'high-volume transaction-specific margins for cooperative companies which are both higher than . . . and . . . close to that rate.'" *See KYD*, 607 F.3d at 766 (quoting *Universal Polybag Co. v. United States*, 577 F. Supp. 2d 1284, 1300–01 (Ct. Int'l Trade 2008)). Commerce selected NSK's "highest transaction-specific dumping margin that forms part of a closely-connected range of transaction-specific margins," 126.44%, as BMW's AFA rate. J.A. 1580. Specifically, Commerce selected NSK's [redacted] highest transaction-specific margin, and several

---

[4] Because BMW did not contest on appeal Commerce's decision to apply an AFA rate, the question before this court was limited to whether the selected AFA rate was supported by substantial evidence and was in accordance with law.

transaction-specific dumping margins fell above and close to 126.44%.[5]

Moreover, the Court of International Trade has upheld AFA rates "based upon a transaction-specific margin 'within the mainstream' of the cooperating respondent's sales, particularly when the agency has not previously reviewed the uncooperative party and could not rely on that party's own deficient data to determine a rate," as was the case here.[6] *iScholar, Inc. v. United States*, 2011 Ct. Int'l Trade LEXIS 3, \*7, slip op. 2011-4 (Ct. Int'l Trade Jan. 13, 2011); *see, e.g.*, *Shanghai Taoen Int'l Trading Co. v. United States*, 360 F. Supp. 2d 1339, 1348 (Ct. Int'l Trade 2005) (finding a party's 223.01% AFA rate non-punitive because it reflected recent commercial activity of a respondent who cooperated in the review and the party's failure to

---

[5]    Although the Majority opinion states that using the highest transaction-specific margin as the AFA rate will depend upon the facts of a particular case, Majority Op. 17, the AFA rate that Commerce selected, 126.44%, is far from the highest transaction-specific margin. It was NSK's [redacted] highest transaction-specific margin—[redacted]% less than NSK's highest transaction-specific margin ([redacted]%). J.A. 1560. To the extent that the Majority relies on changes to the statute that became effective *after* Commerce issued its decision, Majority Op. 16–17 n.3, the relevant portion of the statute is titled "Discretion to apply *highest* rate." 19 U.S.C. § 1677e(d)(2) (2015) (emphasis added). Section 1677e(d)(2) is therefore limited to application of the highest rate, which Commerce did not select, and irrelevant here.

[6]    "A respondent's 'mainstream' sales constitute those 'transactions that reflect sales of products that are representative of the broader range of models used to determine normal value.'" *iScholar*, 2011 Ct. Int'l Trade LEXIS at \*7 n.3 (citation omitted).

accurately respond to Commerce's questions resulted in an egregious lack of record evidence to suggest an alternative rate), *aff'd*, No. 10-1219, slip op. at 2 (Fed. Cir. Dec. 13, 2010). Yet the Majority opinion states that Commerce failed to provide "any articulation of its rationale for finding that the selected rate was not unduly punitive." Majority Op. 18. That, however, is not so.

Beyond selecting a rate within the mainstream of NSK's sales, Commerce reasoned that 126.44% does not overreach reality because BMW argued that NSK's overall weighted-average dumping margin, 1.43%, reflected BMW's commercial reality. J.A. 1588. From BMW's argument, Commerce concluded that NSK's transaction-specific dumping margins—especially those falling on a [redacted] that comprise that weighted-average dumping margin—must have also reflected BMW's commercial reality. *Id.*

Commerce also determined that, despite BMW's claim that the all-others rate of 54.27% would have a reasonable connection to its commercial reality, J.A. 1586, assigning BMW the all-others rate would not ensure that BMW "does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." J.A. 1591. Indeed, the all-other's rate is the same rate received by parties who did not request administrative review and is lower than the 61.14% rate assigned to an individually-investigated respondent who fully cooperated with Commerce. *See BMW of N. Am. LLC v. United States*, 208 F. Supp. 3d 1388, 1397 (Ct. Int'l. Trade 2017). Even BMW concedes that it should not receive a rate lower than the all-others rate. Oral Argument at 9:55–10:06 (Q: "It can't be that when adverse facts are inferred that the party that didn't respond gets to

have a rate that's lower than it would have had had it not asked for review, right"? A: "Well no, not lower than.").[7]

At bottom, "Commerce is in the best position, based on its expert knowledge of the market and the individual respondent, to select adverse facts that will create the proper deterrent to non-cooperation with its investigations and assure a reasonable margin." *De Cecco*, 216 F.3d at 1032. While choosing an AFA rate "with an eye toward deterrence, Commerce acts within its discretion so long as the rate chosen has a relationship to the actual sales information available." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002). The Majority's additional requirement, factoring in a party's "level of culpability" when choosing a particular AFA rate, is therefore misguided.

While that information may be relevant to Commerce's decision to apply an AFA rate in the first place, it need not inform Commerce's actual rate selection decision. *Nippon*, 337 F.3d at 1383 (explaining that § 1677e(b) does not require Commerce to evaluate overall patterns of behavior,

---

[7]    While BMW does take issue with the fact that its AFA rate is "more than twice as high as the 54.27 percent all others rate," Appellant's Br. 48, that fact alone is insufficient to deem its AFA rate punitive. For example, in *De Cecco*—the case on which the Majority relies for the proposition that an AFA rate must not be punitive—this court determined that 24.31% was adverse, not punitive, even though the all-others rate was only 12.09%. 216 F.3d at 1034. And, in *Viet I-Mei Frozen Foods Co. v. United States*, this court upheld an AFA rate that was five times the all-others rate even though the disadvantaged party lodged several justifications for its failure to cooperate. 839 F.3d 1099, 1109–10 (Fed. Cir. 2016).

examine reasons for initial mistakes, or to permit explana-tions of the extenuating circumstances).

Because substantial evidence supports Commerce's AFA rate selection, and it was in accordance with the law, I would affirm the Court of International Trade's judg-ment.